4 U.S. 363
 4 Dall. 363
 1 L.Ed. 867
 Balfour's Lessee
v.
Meade.
 Circuit Court, Pennsylvania District.
 April Term, 1803
 
 1
 THIS was an ejectment for four tracts of land, lying north and west of the Ohio and Alleghany rivers, and Conewango creek, in Pennsylvania. The plaintiff's title rested upon settlement rights, surveys, and warrants. In 1793, the plaintiff was a surgeon in the army in garrison at fort Franklin. He took some of the soldiers, went out, cut down a few trees, and built up five pens, or cabins, about 10 feet square, and, without putting covers on them, returned back to the fort in six or seven days. In April 1795, he had these five tracts surveyed in the name of himself, Elizabeth Balfour, and three others, each four hundred acres. The deputy surveyor had, upon application of the plaintiff, directed one Wilson to make the surveys, but something preventing him from doing it, the plaintiff employed one Steel to do it; and upon returning the surveys to Stokely, the deputy surveyor, he prevailed upon him to write an authority to Steel to make the surveys, which Stokely says he did, and antedated it, in order to make it appear to precede the surveys. In May 1795, he obtained warrants of acceptance for two of the surveys of two of the tracts, having paid the consideration money for all.
 
 
 2
 In autumn 1794, Meade, the defendant, finding no person settled upon these tracts, built cabins upon the four tracts in controversy, covered them, or some of them, and then went off, not returning again until November 1795, when he came, with his family, to reside in one of the cabins, and fixed settlers upon the other tracts. In July 1795, the plaintiff gave notice to the defendant, that he claimed the tracts in question, that he intended to settle them, and forewarned him to proceed no further with his improvements thereon.
 
 
 3
 In January 1796, the defendant caveated the plaintiff in form, and the same being tried before the board of property in March 1800, the caveats were dismissed, and warrants were ordered to issue, but they never did issue, in consequence of doubts afterwards existing respecting the plaintiff's title.
 
 
 4
 In April 1796, the plaintiff made engagements with some persons to settle these lands for him; but, after they had seen and approved the lands, they declined going on them on hearing of the defendant's claim.
 
 
 5
 It was in proof, by many witnesses, that the war with the Indians rendered it dangerous to settle that country, during the years 1793, 1794, and 1795, and that but few attempted before the spring or autumn of 1796.
 
 
 6
 E. Tilghman and Dallas contended, that the plaintiff had acquired a good right by settlement, survey, and warrant, to the lands in question, under the laws of Pennsylvania, and particularly the act of the 3d of April 1792, 3 vol. p. 209.; that the settlement of Meade, in 1795, was in violation of the plaintiff's prior right, and, of course, void; that the plaintiff had been prevented, by the Indian hostilities, from settling, or fixing settlers, until the treaty of fort Grenville, made in August 1795, and ratified in December 1795; and that he had attempted to settle it in a reasonable time after that event. 1 Dall. 6. 2 Dall. 98. 3 Dall. 457. Addison, 216. 354. 218.
 
 
 7
 Ingersoll and M'Kean contended, that the plaintiff never had made a settlement within the meaning of the law, not having accompanied it with actual residence, or an intention to reside; that of course, he never had an inceptive title to be protected by the proviso in the 9th section of the act of the 3d of April 1792. They cited Addison, 248. 335. The case of the Holland company v. Coxe, in the Supreme Court of this state (ante, p. 170.) and the decisions of the judges of that Court, in a feigned issue, tried at Sunbury, ante, p. 237.
 
 
 8
 WASHINGTON, Justice.
 
 
 9
 The importance of this cause, led the Court to wink at some irregularities in the argument at the bar, which have tended to protract it to an unreasonable length. Depending on the construction of laws of the state, and particularly on that of the 3d of April 1792, it had, at first, the appearance of a difficult, and very complicated, case. It is not easy at the first reading of a long statute, to discover the bearings of one section upon another, so as to obtain a distinct view of the meaning, and intention, of the legislature. But the opinion I now entertain, was formed on Saturday, before we parted; open, however, ever, as it always is, to such alterations as ulterior reason and argument may produce.
 
 
 10
 The better to explain, and to understand, the subject, it will be necessary to take a general view of the different sections of the act of the 3d of April 1792, upon which this cause must turn. The 1st section reduces the price of all vacant land, not previously settled, or improved, within the limits of the Indian purchase, made in 1768, and all precedent purchases, to 50s. for every 100 acres; that of the vacant lands within the Indian purchase made in 1784, lying east of Alleghany river and Conewango creek, to 5l., to be granted to purchasers, in the manner authorised by former laws. The 2d section offers for sale all the other lands of the state, lying north and west of the Ohio, Alleghany, and Conewango, to persons who will cullivate, improve, and settle the same, or cause it to be done, at the price of 7l. 10s. per hundred acres, to be located, surveyed, and secured, as directed by this law. It is to be remarked, that all the above lands lie in different districts, and are offered at different prices. Title to any of them may be acquired by settlement, and to all, except those lying north and west of the Ohio, Alleghany, and Conewango, by warrant without settlement.
 
 
 11
 The 3d section, referring to all the above lands, authorises applications to the secretary of the land office, by any person having settled and improved, or who was desirous to settle and improve, a plantation to be particularly described; for a warrant for any quantity of land, not exceeding 400 acres, which warrant is to authorise and require the surveyor general to cause the same to be surveyed, and to make return of it, the grantee paying the purchase money and fees of office. The 8th section, which I notice in this place because intimately connected with the third section, directs the deputy surveyor to survey and mark the lines of the tract, upon the application of the settler. This survey, I conceive, has no other validity than to furnish the particular description, which must accompany the application at the land office for a warrant.
 
 
 12
 The 4th section, amongst other regulations, protects the title of an actual settler, against a warrant entered with the deputy surveyor, posterior to such actual settlement.
 
 
 13
 The 9th section, referring exclusively to the lands north and west of the Ohio, Alleghany, and Conewango, declares, 'that no warrant or survey of lands within that district, shall give a title, unless the grantee has, prior to the date of the warrant, made, or caused, to be made, or shall, within two years after the date of it, make, or cause to be made, an actual settlement, by clearing, fencing, and cultivating two acres at least in each hundred acres, erecting thereon a house for the habitation of man, and residing, or causing a family to reside thereon for five years next following his first settling the same, if he shall so long live, and in default of such actual settlement and residence, other actual settlers may acquire title thereto.'
 
 
 14
 Let us now consider this case, as if the law had stopped here. A title to the land in controversy, lying north and west of the Ohio, Alleghany, and Conewango, could be acquired in no other manner, than by actual settlement; no sum of money could entitle a person to a warrant, unless the application was preceded by actual settlement on the land, or, if not so preceded by actual settlement, the warrant would give no title, unless it were followed by such settlement within two years thereafter.
 
 
 15
 The question then is, what constitutes such an actual settler, within the meaning and intention of this law, as will vest in him an inceptive title so as to authorise the granting to him a warrant; not a pedis possessio not the erection of a cabin, the clearing, or even the cultivation, of a field. These acts may deserve the name of improvements, but not settlements. There must be an occupancy, accompanied with a bon a fide intention to reside and live upon the land, either in person, or by that of his tenant, to make it the place of his habitation, not at some distant day, but at the time, he is improving: for, if this intention be only future, either as to his own personal residence or that of a tenant, then the execution of that intention, by such actual residence, fixes the date; the commencement of the settlement, and the previous improvements, will stand for nothing in the calculation.
 
 
 16
 The erection of a house, and the clearing and cultivating the ground, all or either of them may afford evidence of the quo animo with which it was done; of the intention to settle; but neither, nor all will, constitute a settlement, if unaccompanied by residence. Suppose, then, improvements made, the person making them declaring at the time, that they were intended for temporary purposes of convenience, and not with a view to settle and reside; could this be called an actual settlement, within the meaning and intention of the legislature? Surely no: But though such acts, against express declarations of the quo animo, will not make a settlement, it does not follow that the converse of the proposition will; for, a declaration of an intention to settle, without actually carrying that intention into execution, will not constitute an actual settlement.
 
 
 17
 How do these principles apply to the case of the plaintiff? In 1793, he leaves the fort at which he was stationed, and in which he was an officer, with a few soldiers; cuts down some trees, erects four or five pens (for, not being covered, they do not deserve the name of cabins) and in five, six, or seven days, having accomplished this work, he returns into the fort, to his former place of residence. Why did he retreat so precipitately? We hear of no danger existing at the time of completing these labours, which did not exist during the time he was engaged in them. What prevented him from proceeding to cover the cabins and from inhabiting them? Except the state of general hostility, which existed in that part of the country, there is no evidence of a particular necessity for flight, in the instance of this plaintiff. It is most obvious, that the object of his visit to this wilderness was to erect what he considered to be improvements; but they were, in fact, uninhabitable by a human being, and, consequently, could not have been intended for a present settlement. He was, besides, an officer in the army, and, whilst in that service, he could not settle and reside at his cabin, although the the country had been in a state of perfect tranquillity. In short, his whole conduct, both at that time and afterwards; his short, his whole conduct, asserting a title to the lands, the recitals in his warrants of acceptance, and certificates of survey, all afford proof which is irresistable, that he did not mean, in 1793, to settle. Mistaking the law, as it seems many others have done in this respect, he supposed that an improvement was equivalent to a settlement, for vesting a right in those lands. It is not pretended even now, nor is it proved by a single witness, not even by Crouse, who assisted in making the improvements, that he contemplated a settlement. It has been asked, could the legislature have meant to require persons to sit down, for a moment, on land encompassed by dangers from a savage enemy? I answer, no: at such a time it was very improbable that men would be found rash enough to make settlements. But yet no title could be acquired without such a settlement, and if men were found hardy enough to brave the dangers of a savage wilderness, they might be called imprudent men, but they would, also, deserve the promised reward, not for their boldness, but for their settlement.
 
 
 18
 The first evidence we have of an intention in the plaintiff to make an actual settlement, was in the spring of 1796, long after the actual bon a fide settlement of the defendant with his family; for, I give no credit to the notice from the plaintiff to the defendant in July 1795, since so far from accompanying it with actual settlement, he speaks of a future settlement, which, however, was never carried into execution. Every thing which I have said with respect to the 400 acres surveyed in the name of George Balfour, will apply a fortiori against the three other surveys in the name of Elizabeth Balfour, &c. who it is not pretended were ever privy even to the making of the cabins, or ever contemplated a settlement upon those lands.
 
 
 19
 If the law, then, had stopped at the proviso, it is clear that the plaintiff never made such a settlement as would entitle him to a warrant. But he excuses himself from having made such a settlement, as the law required, by urging the danger to which any person, attempting a residence in that country, would have beer exposed. He relies on the proviso to the 9th section of the law, which declares, 'That if any such actual settler, or any grantee in any such original or succeeding warrant, shall, by force of arms of the enemies of the United States, be prevented from making such actual settlement, or be driven therefrom, and shall persist in his endeavours to make such actual settlement as aforesaid, then, in either case, he and his heirs shall be entitled to have, and to hold, the said lands, in the same manner as if each actual settlement had been made and continued.' Evidence has been given of the hostile state of that country, during the years 1793, 1794, 1795, and the danger to which settlers would have been exposed. We know that the treaty at fort Grenville was signed on the 3d of August 1795, and ratified the 22d of December in the same year. Although Meade settled with his family in November 1795, it is not conclusive proof that there was no danger even then; and, at any rate, it would require some little time, and preparation, for those who had been driven off, to return to their settlements; and if the cause turned upon the question, whether the plaintiff had persevered in his exertions to return and make such settlement, as the law requires, I should leave that question to the jury, upon the evidence they have heard. But the plaintiff, to entitle himself to the benefit of the proviso, should have had an incipient title at some time or other, and this could only have been created by actual settlement, preceding the necessity, which obliges him to seek the benefit of the proviso, or by warrant.
 
 
 20
 I do not mean to say, that he must have had such an actual settlement, as this section requires to give a perfect title; for, if he had built a cabin, and commenced his improvement in such manner, as to afford evidence of a bon a fide intention to reside, and had been forced off by the enemy, at any stage of his labours, persevering, at all proper times afterwards, in endeavours to return, when he might safely do so, he would have been saved by the proviso. But it is incumbent on the plaintiff, if he would excuse himself from the performance of what has been correctly called a condition precedent, to bring himself fully and fairly within the proviso, which was made for his benefit: this he has not done.
 
 
 21
 Decisions in the Supreme Court, and in the Common Pleas, of this state, have been cited at the bar, two of which I shall notice for the purpose of pointing out the peculiar mark, which distinguishes them from the present, and to prevent any conclusions from being drawn from what has been said, either to countenance, or impeach, those decisions. The cases I allude to are, the Holland company v. Coxe, and the feigned issue tried at Sunbury.
 
 
 22
 The incipient title, under which the plaintiffs claimed in those causes, were warrants, authorised by the 3d section of the law. The incipient title in the present case, is settlement. The former was to be completed by settlement, survey, and patent. This was to precede the warrant; and for the more distinct explanation of this distinction, it will be important to ascertain what acts will constitute an actual settler to whom a warrant may issue, and what constitute an actual settlement as the foundation of a title. I have before explained, who may be an actual settler to demand a warrant, namely, one who has gone upon and occupied land, with a bona fide intention of an actual present residence, although he should have been compelled to abandon his settlement, by the public enemies, in the first stages of his settlement: but actual settlement, intended by the 9th sections, consists in clearing, fencing, and cultivating, two acres of ground at least, on each one hundred acres, erecting a house thereon, fit for the habitation of man, and a residence continued for five years next following his first settling, if he shall so long live. This kind of settlement more properly deserves the name of improvements, as the different acts to be performed clearly import. This will satisfactorily explain what at first appeared to be an absurdity in that part of the proviso, which declare, that 'if such actual settler shall be prevented from making such actual settlement, &c.' The plain meaning is, that if a person has once occupied land, with an intention of residing, although he has neither cleared or fenced any land, and is forced off by the enemies of the United States, before he could make the improvements, and continue thereon for five years; having once had an incipient title, he shall be excused by the necessity, which prevented his doing what the law required, and in the manner required; or, if the warrant holder, who, likewise, has an incipient title, although he never put his foot upon the land, shall be prevented by the same cause, from making these improvements, &c. he, too, shall be excused, if, as is required, also, of the settler, he has persevered in his endeavours to make those improvements, &c.
 
 
 23
 But what it becomes such a grantee to do, before he can claim a patent, or even a good title, is quite another question, upon which I give no opinion.
 
 
 24
 As to the plaintiff's surveys and warrants, they cannot give him a title. Not the surveys. 1st. Because they are a mere description of the land, which the surveyor is authorised by the 8th section to make, and the applicant for the warrant is directed, by the 3d section, to lodge in the land office at the time he applies for the warrant. It is merely a demarcation, a special location of the land intended to be appropriated, and gives notice of the bounds thereof, that others may be able to make adjoining locations, without danger of interference: that is not such a survey as is returnable, so as to lay the foundation of a patent. 2d. It is not authorised by a warrant. 3d. It was not for an actual settler. 4th. It was not made by an authorised surveyor, if you believe, upon the evidence, that the authority to Steel, was antedated, and given after the survey was returned. Not the warrants. 1st. Because it was not a warrant of title, but of acceptance. 2d. It is not founded on settlement, but improvement, and if it had recited the consideration to be actual settlement, the recital would have been false in fact, and could have produced no legal valid consequence.
 
 
 25
 As to the caveat; the effect of it was to close the doors of the land office against the further progress of the plaintiff in perfecting his title. The dismission of it again opened the door, but still, the question as to title is open for examination in ejectment, if brought within six months, and the patent will issue to the successful party.
 
 
 26
 The plaintiff, therefore, having failed to show a title sufficient to enable him to recover in this action, it is unnecessary to say any thing about the defendant's title; and your verdict ought to be for the defendant.
 
 
 27
 The jury found for the defendant.